IN THE SUPREME COURT OF NORTH CAROLINA

No. 281A19

Filed 5 June 2020

IN THE MATTER OF: I.N.C. and E.R.C.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 8 April 2019 by Judge Monica M. Bousman in District Court, Wake County. This matter was calendared for argument in the Supreme Court on 4 May 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

> *Mary Boyce Wells, for petitioner-appellee Wake County Human Services.*
>
> *N.C. Administrative Office of the Courts Guardian Ad Litem Division, by Michelle FormyDuval Lynch, Staff Attorney, for appellee guardian ad litem.*
>
> *Mary McCullers Reece for respondent-appellant father.*
>
> *Sean P. Vitrano for respondent-appellant mother.*

ERVIN, Justice.

Respondent-father Stephen C. and respondent-mother Ashley C. appeal from an order terminating their parental rights in their minor children I.N.C. and E.R.C.[1] After careful consideration of the record in light of the applicable legal principles, we

---

[1] The minor children will be referred to throughout the remainder of this opinion as "Ivan" and "Edward," which are pseudonyms used to protect the children's identities and for ease of reading.

hold that the trial court did not abuse its discretion by determining that termination of the parents' parental rights would be in the children's best interests and, for that reason, affirm the trial court's termination order.

On 9 January 2014, Wake County Human Services filed a juvenile petition alleging that Ivan and Edward were abused and neglected juveniles and obtained the entry of an order authorizing WCHS to take the children into non-secure custody. In its petition, WCHS alleged that respondent-father had substance abuse problems, that respondent-mother had inappropriately disciplined the children and had violently shaken another child, and that the parents had a history of domestic violence that included a recent incident in which respondent-mother had attempted to run over respondent-father with a car in which the children were passengers.

On 11 February 2014, the trial court entered a consent adjudication and disposition order. In determining that Ivan and Edward were neglected juveniles, the trial court concluded that the children had not received proper care and supervision from the parents and that they lived in an environment that was injurious to their welfare. In light of this determination, the trial court ordered that the children remain in WCHS custody and directed WCHS to make reasonable efforts to eliminate the need for the children's placement outside of the family home. In addition, the trial court ordered respondent-mother to (1) visit with the children in accordance with a written visitation plan; (2) maintain adequate housing; (3) obtain and maintain suitable employment; (4) undergo a psychological evaluation that

addressed her need for domestic violence and substance abuse treatment and comply with any treatment recommendations; (5) complete a parenting class and demonstrate the skills that she had learned during that class; and (6) maintain regular contact with WCHS. Similarly, the trial court ordered respondent-father to (1) visit with the children in accordance with a written visitation plan; (2) maintain adequate housing; (3) obtain and maintain suitable employment; (4) complete a substance abuse treatment program, follow any treatment recommendations that were made for him during that program, refrain from using illegal or impairing substances, and submit to random drug screens in order to permit a determination concerning whether he was using such substances; (5) complete a mental health assessment and comply with any treatment recommendations; (6) complete a domestic violence assessment and comply with any treatment recommendations; (7) complete a parenting class and demonstrate the skills that he had learned during that class; and (8) maintain regular contact with WCHS.

On 17 November 2014, the trial court entered an order providing that WCHS should cease efforts to reunify respondent-father with the children on the grounds that he had declined to participate in the services to which he had been referred by WCHS and that he had failed to demonstrate compliance with any aspect of his court-ordered case plan. On the other hand, the trial court directed WCHS to continue to make reasonable efforts to reunify the children with respondent-mother. On 29 May 2015, the trial court entered an order establishing a primary permanent plan of

reunifying the children with respondent-mother. After respondent-father began to make efforts to comply with his case plan, the trial court entered an order on 30 November 2015 providing that WCHS should resume efforts to reunify the children with respondent-father as well and changing the permanent plan for the children to a primary plan of reunification with either parent and a secondary plan of adoption. On 17 May 2016, the trial court entered an order finding that the parents were making only limited progress toward complying with the provisions of their case plans, finding that it would be in Ivan and Edward's best interests to suspend their visitation with the parents in order to allow them to focus upon the therapy that they were being provided, and changing the permanent plan for the children to a primary plan of adoption and a secondary plan of reunification with either parent.

On 12 December 2016, WCHS filed a petition seeking to have the parents' parental rights in Ivan and Edward terminated on the grounds of neglect and failure to make reasonable progress toward correcting the conditions that had led to the children's removal from the family home. *See* N.C.G.S. § 7B-1111(a)(1)–(2) (2019). After an eight-day hearing held during 2017, the trial court entered an order dismissing the termination petition on 5 February 2018. After finding that neither parent could demonstrate appropriate parenting skills and that both of the grounds for termination alleged in the termination petition existed, the trial court determined that there was not a strong probability that the children would be adopted and expressed the hope that, "with continued services," "adoption will become more likely

in the future if the parents are not able to soon provide permanent care for the children." As a result, the trial court concluded that termination of the parents' parental rights in Ivan and Edward would not be in the children's best interests. In addition, the trial court required the parents to have weekly supervised visits with Ivan and Edward and ordered the parents to participate in the children's therapy as recommended by the children's therapists.

Shortly after the dismissal of the initial termination petition, the parents were involved in an incident of domestic violence that resulted in the summoning of law enforcement officers to their residence. Respondent-mother claimed that respondent-father had choked her and thrown her into a couch, while respondent-father claimed that respondent-mother had choked him, scratched him, and hit him on the head with a coffee cup. In the aftermath of this incident, respondent-father obtained the entry of a domestic violence protective order against respondent-mother. On 8 March 2018, WCHS filed a motion seeking to have the nature and extent of the parents' visitation with the children reviewed. On 12 April 2018, the trial court entered an order suspending the parents' visitation with the children based upon determinations that the parents had continued to engage in inappropriate behavior in the presence of the children, that the behavior of the children had deteriorated since visitation with the parents had been resumed, and that Ivan's therapist believed that the children's significant and ongoing behavioral problems could be attributed to the long-term uncertainties that they faced.

On 8 June 2018, the trial court entered a permanency planning order providing that the primary permanent plan for the children continued to be adoption and that the secondary plan for the children would be reunification with either parent. In addition, the trial court ordered the parents to comply with the provisions of their case plans and ordered WCHS to take the steps necessary to obtain a permanent placement for the children.

On 14 June 2018, WCHS filed a second termination petition in which it alleged that the parents' parental rights in Ivan and Edward were subject to termination on the grounds of neglect, failure to make reasonable progress toward correcting the conditions that had led to the children's removal from the family home, and willful failure to pay a reasonable portion of the cost of the care that the children had received while in WCHS custody. *See* N.C.G.S. § 7B-1111(a)(1)–(3) (2019). After a hearing held on 13 February 2019, the trial court entered an order terminating the parents' parental rights in Ivan and Edward on 8 April 2019. In its termination order, the trial court concluded that the parents' parental rights in the children were subject to termination for neglect and failure to make reasonable progress and that WCHS had failed to show that the parents had willfully failed to pay a reasonable portion of the cost of the children's care. In addition, the trial court concluded that the termination of the parents' parental rights would be in the children's best interests. Respondent-father and respondent-mother both noted appeals to this Court from the trial court's termination order.

The termination of a parent's parental rights in a juvenile is a two-stage process which involves both an adjudicatory and a dispositional determination. *See* N.C.G.S. §§ 7B-1109, -1110 (2019). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6, 832 S.E.2d 698, 700 (2019) (quoting N.C.G.S. § 7B-1109(f) (2017)). "If a trial court finds one or more grounds to terminate parental rights under N.C.G.S. § 7B-1111(a), it then proceeds to the dispositional stage," *id.* at 6, 832 S.E.2d at 700, at which it "determine[s] whether terminating the parent's rights is in the juvenile's best interest." N.C.G.S. § 7B-1110(a). As a result of the fact that neither respondent-father nor respondent-mother has challenged the lawfulness of the trial court's adjudicatory decision, the only issues that we are required to consider in this case arise from the trial court's dispositional determination.

In determining whether the termination of a parent's parental rights in a child would be in that child's best interests,

> [t]he court may consider any evidence, including hearsay evidence as defined in [N.C.]G.S. [§]8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile. In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.

(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.

(4) The bond between the juvenile and the parent.

(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.

(6) Any relevant consideration.

*Id.* A trial court's determination concerning whether termination of parental rights would be in a juvenile's best interests "is reviewed solely for abuse of discretion." *In re A.U.D.*, 373 N.C. at 6, 832 S.E.2d at 700 (citing *In re D.L.W.*, 368 N.C. 835, 842, 788 S.E.2d 162, 167 (2016)). "[A]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Id.* at 6–7, 832 S.E.2d at 700–01 (quoting *In re T.L.H.*, 368 N.C. 101, 107, 772 S.E.2d 451, 455 (2015)).

In concluding that the termination of the parents' parental rights in Ivan and Edward would be in the children's best interests, the trial court found:

42. The children and the parents have a bond, but that bond is not healthy. The children miss their parents, but they are now optimistic about finding permanent homes with other appropriate families and moving forward. The children no longer look to either parent to provide basic care, meet their needs, or keep them safe. The parents are more like playmates than parents who can appropriately love, discipline, and accept each child's mental health need[s] and ensure that those issues are treated appropriately.

43.    [Edward], age 10 and [Ivan], age 9, have been in WCHS custody since 2014 and need permanence. The ongoing uncertainty about their placements and false hopes of returning home only exacerbates the children's behaviors.

44.    [Edward] was hospitalized at Holly Hill Hospital in Raleigh, NC in November-December 2018 following an emotional outburst and threats of self-harm. He was discharged to another foster home and was soon thereafter hospitalized again in early February [2019]. He is currently a patient at Strategic PRTF in Leland, NC where he receives ongoing therapy and treatment. [Edward] will likely not return to the same placement as his brother.

45.    [Ivan] has made considerable progress and his behaviors have improved. He remains in the same licensed therapeutic foster home and has adapted well to the separation from [Edward].

46.    The Children's Home Society has initiated child-specific recruitment for both boys. The adoption worker, Wendy Tarlton, has met with both children and began an extensive search for preadoptive homes that would be capable of addressing the needs of each child, even if the boys have to be adopted separately. The likelihood of finding a preadoptive home would increase significantly if the boys were free for adoption and legal risk was removed.

47.    Both children are capable of forming positive, permanent bonds with new caregivers and both want to find safe, permanent homes. Each child has accepted that reunification with either parent is not possible because of the parent's behaviors which they have witnessed both [prior to] removal from the parent's custody and on multiple occasions since removal.

48.    The Court finds that there is a likelihood of adoption as long as the children continue to receive

appropriate services and that termination of parental rights would aid in the accomplishment of the permanent plan of adoption. The children have been in the custody of Wake County Human Services for more than five years and should have the opportunity to achieve permanence that can only be possible with the termination of the parental rights of each parent.

49.     The parents do not appear to fully understand the boys' behaviors and the necessity for comprehensive ongoing treatment. The parents deny that the children need medication despite the recommendations of all treatment providers and downplay each child's diagnosed conditions. Neither parent accepts any responsibility for the children's mental health needs even though the children express vivid memories of domestic violence and inappropriate discipline while in the care of either parent.

According to the parents, the trial court's dispositional findings fail to support its determination that termination of their parental rights in Ivan and Edward would be in the children's best interests. More specifically, the parents argue that the trial court's finding that there is a likelihood that Ivan and Edward would be adopted lacks sufficient evidentiary support given the children's history of behavioral problems. On the contrary, respondent-mother asserts that the record evidence showed nothing more than a speculative possibility that the children would be adopted, while respondent-father asserts that the record evidence failed to demonstrate any significant likelihood that adoption would occur. We do not find the parents' arguments to be persuasive.

As we read the record, the trial court's finding concerning the likelihood that the children would be adopted is supported by testimony provided by the guardian *ad litem*, the social worker, and the adoption specialist. The adoption specialist testified that her efforts to place Ivan and Edward in an adoptive home were currently limited and that the termination of the parents' parental rights in the children was a necessary prerequisite to the making of more specific efforts to find adoptive homes for the children, such as posting photos and videos of them on line, setting up meetings and "matching events" with potential adoptive parents, and reviewing the qualifications of potential adoptive parents to determine if they would be able to meet the needs of the children. After acknowledging that it is more difficult to find adoptive homes for "older children," the adoption specialist testified that locating adoptive families for Ivan and Edward was just a matter of finding "the right fit" for them and asserted that the termination of the parents' parental rights in the children would increase the children's chances for adoption "a great deal." In addition, the social worker testified that both Ivan and Edward wanted a home that they could call their own and that, even though both children had certain behavioral issues, they were adoptable. Similarly, a social worker expressed the opinion that the children had lost confidence that they would be able to return to their parents' care and would "like to move on." Finally, the guardian *ad litem* testified that the children were able to form the bonds with other people necessary to facilitate adoption and that they were adoptable. As a result, we hold that the trial court's finding relating to the

likelihood that Ivan and Edward would be adopted has the requisite evidentiary support and is binding for purposes of appellate review in spite of the fact that no witness attempted to quantify the likelihood that the children would be adopted with mathematical precision. *See Pulliam v. Smith*, 348 N.C. 616, 625, 501 S.E.2d 898, 903 (1998) (noting that, in cases in which the trial court sits as the trier of fact, its "findings of fact have the force and effect of a verdict by a jury and are conclusive on appeal if there is evidence to support them, even though the evidence might sustain findings to the contrary" (quoting *Williams v. Pilot Life Ins. Co.*, 288 N.C. 338, 342, 218 S.E.2d 368, 371 (1975))); *In re Montgomery*, 311 N.C. 101, 110–11, 316 S.E.2d 246, 252–53 (1984) (stating that "our appellate courts are bound by the trial courts' findings of fact where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary" (citing *Williams*, 288 N.C. at 342, 218 S.E.2d at 371)).

In addition, respondent-mother contends that the trial court's findings of fact relating to the nature and extent of her bond with the children lack support in the record evidence. After conceding that the findings that the trial court did make with respect to this subject rested upon testimony provided by the social worker, respondent-mother claims that other evidence shows that the trial court's determination with respect to the bonding issue was incorrect. In view of the fact that the trial court's findings relating to the nature and extent of respondent-mother's bond with the children are supported by the social worker's testimony, they are, for

the reasons stated above, binding upon this Court for purposes of appellate review regardless of the fact that the record contains evidence that might be sufficient to support a contrary determination. *Id.*

In addition to their challenges to certain of the trial court's findings of fact, the parents assert that the trial court erred by finding that a number of the statutory criteria set out in N.C.G.S. § 7B-1110(a) weighed in favor of, rather than against, the termination of their parental rights in Ivan and Edward. After conceding that the trial court accurately identified the children's ages, the parents argue that the trial court should have found that the children's ages weighed against a determination that the termination of their parental rights would be in the children's best interests given that older children are typically more difficult to place in adoptive homes than younger children and given that, after reaching the age of twelve, children have to consent to any proposed adoption. In addition, respondent-father argues that, in light of his bond with the children, the trial court erroneously failed to consider the "inherent value of an affectionate relationship with a parent" and "the uncertainty inherent in severing the parental relationship without having an identified adoptive placement." The parents also point to the fact that the trial court did not make any findings of fact regarding the bond between the children and any proposed adoptive parent or other permanent placement given that no such potential permanent placement existed at the time of the termination hearing. According to the parents, these "bonding" factors weigh against or, at least, do not support, the termination of

their parental rights in Ivan and Edward in light of the fact that moving the children into potential adoptive homes would disrupt the bonds that the children have with their current foster parents.

The ultimate problem with this aspect of the parents' challenge to the trial court's termination order is that the responsibility for weighing the relevant statutory criteria delineated in N.C.G.S. § 7B-1110(a) lies with the trial court, which "is permitted to give greater weight to other factors," rather than with this Court. *In re Z.L.W.*, 372 N.C. 432, 437, 831 S.E.2d 62, 66 (2019). To the extent that the parents are asking this Court to reweigh the evidence contained in the record developed at the termination hearing and to substitute our preferred weighing of the relevant statutory criteria for that of the trial court, such an approach would be inconsistent with the applicable standard of review, which focuses upon whether the trial court's dispositional decision constitutes an abuse of discretion rather than upon the manner in which the reviewing court would weigh the evidence were it the finder of fact. *See, e.g., Little v. Penn Ventilator Co.*, 317 N.C. 206, 218, 345 S.E.2d 204, 212 (1986) (stating that, in cases subject to review using an abuse of discretion standard, "the purpose of the reviewing court is not to substitute its judgment in place of the decision maker," with the reviewing court being limited to "insur[ing] that the decision could, in light of the factual context in which it is made, be the product of reason"). As a result, we decline to accept any invitation to reweigh the evidence and make an independent dispositional decision on appeal that the parents may be extending.

In arguing that the trial court's dispositional decision constituted an abuse of discretion, the parents place their principal reliance upon the Court of Appeals' decision in *In re J.A.O.*, 166 N.C. App. 222, 601 S.E.2d 226 (2004). The juvenile in *In re J.A.O.* had "a history of being verbally and physically aggressive and threatening" and had "been diagnosed with bipolar disorder, attention deficit hyperactivity disorder, pervasive developmental disorder, borderline intellectual functioning, non-insulin dependent diabetes mellitus, and hypertension." *Id.* at 228, 601 S.E.2d at 230. In addition, the juvenile in *J.A.O.* had "been placed in foster care since the age of eighteen months and ha[d] been shuffled through nineteen treatment centers over the last fourteen years." *Id.* at 227, 601 S.E.2d at 230. On the other hand, the juvenile's mother "had made reasonable progress to correct the conditions that led to the petition to terminate her parental rights." *Id.* at 224, 601 S.E.2d at 228. At the termination hearing, the guardian *ad litem* advised the trial court that the juvenile was unlikely to be adopted and that termination of parental rights would not be in the juvenile's best interests because it would "cut him off from any family that he might have." *Id.* at 227, 601 S.E.2d at 230. In spite of the fact that the trial court found that there was only a "small 'possibility' " that the juvenile would be adopted, it, nevertheless, concluded that termination would be in the juvenile's best interests. *Id.* at 228, 601 S.E.2d at 230. On appeal, however, the Court of Appeals held that the trial court had abused its discretion by determining that termination would be in the juvenile's best interests on the grounds that "the remote chance of adoption in this

case [did not] justif[y] the momentous step of terminating [the mother's] parental rights." *Id.*

The facts set out in the record before us in this case are easily distinguishable from those at issue in *In re J.A.O.* Ivan and Edward were nine and ten years old, respectively, at the time that the trial court's order was entered and are currently ten and eleven years old. On the other hand, the juvenile at issue in *In re J.A.O.* was fourteen years old at the time of the termination hearing and was sixteen years old at the time of the Court of Appeals' decision. *Id.* at 227 n.3, 601 S.E.2d at 229 n.3. Although Ivan and Edward both have mental health difficulties, their psychological and behavioral problems do not appear to be as severe as those from which the juvenile in *In re J.A.O.* suffered. *Id.* at 226–27, 601 S.E.2d at 229–30. In addition, while the guardian *ad litem* testified that Ivan and Edward were adoptable and that it would be in their best interests to terminate the parents' parental rights, the guardian *ad litem* in *In re J.A.O.* opposed termination. *Id.* Finally, while the evidence before the trial court in *In re J.A.O.* showed that the juvenile's mother had made reasonable progress toward correcting the conditions that led to the juvenile's removal from her care, *id.* at 224, 601 S.E.2d at 228, the same cannot be said for the parents of the children in this case. More specifically, the trial court found that, five years after the removal of the children from the family home, the parents still failed to fully understand their children's behaviors or the necessity for the children to receive comprehensive ongoing treatment and had not accepted any responsibility for

meeting the children's mental health needs. As a result, we are not persuaded that this case bears any significant resemblance to *In re J.A.O.*

A careful review of the trial court's dispositional findings shows that the trial court considered all of the relevant statutory criteria set out in N.C.G.S. § 7B-1110(a) and made a reasoned determination that termination of the parents' parental rights in the children would be in the children's best interests, with this decision resting primarily upon the parents' failure to make progress in addressing their ability to deal with the children's needs, the children's relative youth, the likelihood that the children would be adopted, and the children's need for permanence after more than five years in WCHS custody. *See In re Montgomery*, 311 N.C. at 109, 316 S.E.2d at 251 (emphasizing that "the fundamental principle underlying North Carolina's approach to controversies involving child neglect and custody [is] that the best interest of the child is the polar star"). The trial court's dispositional decision appears to us to rest upon a proper consideration of the appropriate criteria, a reasonable view of the record evidence, and a reasoned analysis of the children's best interests. As a result, since the trial court did not abuse its discretion in determining that the best interests of Ivan and Edward would be served by terminating the parents' parental rights, we affirm the trial court's termination order.

AFFIRMED.